

U.S. Department of Justice

United States Attorney
District of Maryland

*Paul Riley*
*Assistant United States Attorney*
*Paul.Riley@usdoj.gov*

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4959*
*MAIN: 410-209-4800*
*FAX: 410-962-3091*

**VIA ECF**                                                                 February 14, 2025

The Honorable Richard D. Bennett
United States District Judge
United States District Court
for the District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Re:   *United States of America v. Joseph Gillespie*, Crim. No. RDB-23-321

Dear Judge Bennett:

The Government writes this letter in advance of the sentencing of Defendant Joseph Gillespie, which is currently scheduled for February 20, 2025, at 2:30 p.m. On August 30, 2024, the Court accepted Defendant's guilty plea to Count One of the Indictment, charging him with Wire Fraud Conspiracy, in violation of 18 U.S.C. § 1349. During the Rule 11 hearing, Defendant, formerly a Baltimore City Department of Finance official, admitted to (1) routinely accepting bribes for a period of nearly a decade to extinguish financial obligations owed to the City; and (2) obtaining fraudulently COVID-19 relief funds.

As set forth more fully below, the Government requests that the Court sentence Defendant to 60 months' (5 years') imprisonment, to be followed by three years of supervised release, and order restitution in the total amount of $1,393,104—$143,104 to the United States Small Business Administration and $1,250,000 to the City of Baltimore.

**I.   Background**

As detailed in the parties' plea agreement filed August 30, 2024 (ECF No. 23) and the PSR filed October 29, 2024 (ECF No. 26), beginning in July 2020 and continuing through August 2021 in the District of Maryland, Defendant and co-conspirator Ahmed ("Adam") Sary engaged in a scheme to defraud a financial institution, Cross River Bank, and the United States Small Business Administration ("SBA"), to obtain fraudulent loans for various purported businesses under the Paycheck Protection Program ("PPP"), which was part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, and the Economic Injury Disaster Loan ("EIDL") program.

Ultimately, Defendant fraudulently obtained $143,104 in fraudulent PPP and EIDL funds as part of the scheme, and he attempted to obtain $28,366 in EIDL funds too. However, that EIDL loan ultimately did not close.

Moreover, in addition to the CARES Act fraud scheme, Defendant also engaged in a bribery scheme for over eight years whereby, in exchange for bribes from various property owners in Baltimore City, Defendant would use his official position as an employee of the City to extinguish various financial obligations owed to the City, including for water bills and property taxes.

Typically, Defendant was paid a bribe of ten to fifteen percent of the amount of the financial obligation owed to the City. Defendant received more than $250,000 in connection with the scheme and caused losses to the City in excess of $1,250,000.

His schemes are described in further detail below.

## CARES Act Fraud Scheme

### *EIDL Advance ($5,000) and PPP Loan ($138,104) – JAG Investments*

On or about July 9, 2020, Defendant made and caused to be made materially false and fraudulent pretenses, representations, and promises to the SBA in connection with the EIDL application for JAG Investments—a real estate company owned by Defendant—including the business's gross revenues and number of employees. For example, the application falsely claimed that JAG Investments had five (5) employees and gross revenue of $20,000 for the twelve months prior to January 31, 2020.

The EIDL was ultimately declined by the SBA on the grounds of "Prohibited EIDL business activity. Real estate development." However, as a result of the application, on or about July 14, 2020, an EIDL advance of $5,000 was funded and distributed to a Wells Fargo bank account controlled by Defendant.

Defendant on January 16, 2021, also attempted to obtain a fraudulent EIDL for JAG Investments in the amount of $28,366. The loan ultimately did not close.

On March 4, 2021, Sary, with the assistance of Defendant, submitted a fraudulent PPP loan application to Cross River Bank to obtain a PPP loan for JAG Investments.

The PPP loan application contained multiple material misrepresentations, including that JAG Investments in 2019 had 19 employees and an average monthly payroll of $55,241.94. In support of the loan application, a fabricated 2019 Internal Revenue Service (IRS) Form 940—Employer's Annual Federal Unemployment Tax Return—was submitted, which falsely indicated that the entity's "[t]otal payments to all employees" in 2019 was $276,209.72.

The IRS Form 940 was not legitimate, and the information within it was false. In fact, JAG Investments had no employees and did not report paying any wages to or withholding federal income tax from any employees during the 2019 tax year—as confirmed by IRS records.

The PPP loan application also contained a fake and fraudulent February 2020 Wells Fargo bank statement for a Wells Fargo account in the name of JAG Investments and controlled by Defendant. The purported Wells Fargo Bank statement contained several alterations including a false and grossly over-inflated account ending balance, an incorrect transaction date range, and altered state locations associated within the transactional activity. Additionally, the actual Wells Fargo Bank account statement for the JAG Investments account shows a beginning and ending balance of $541.63, whereas the altered statement submitted with the loan application provided shows a beginning balance of $62,968.81 and an ending balance of $61,439.16.

Additionally, Defendant provided Sary copies of various documents to be submitted in connection with the PPP loan application, including photographs of his driver's license and a letter from the IRS assigning an Employer Identification Number for JAG Investments

Based on the false representations and fraudulent submissions made on behalf of Defendant as the owner of JAG Investments on March 6, 2021, the PPP loan was funded, and approximately $138,104 was distributed by Cross River Bank to a First National Bank ("FNB") bank account controlled by Defendant.

Defendant paid Sary a kickback payment for his work in submitting the false application and obtaining the fraudulent PPP loan. After the PPP loan funds were received by Defendant, he provided Sary with three checks, each dated March 11, 2021, totaling $38,000—approximately 27% of the PPP loan amount—which were ultimately drawn on JAG Investment's bank account controlled by Defendant.

The checks provided to Sary were signed by Defendant and in the amounts of $15,000, $13,500, and $10,000. On each of those checks, Defendant left the payee name blank. Thereafter, Sary—to launder the proceeds and attempt to conceal their nature and purpose—wrote a different payee name on each of those checks and deposited them in accounts he controlled.

### *Establishment of Payroll for Purported Employees*

According to the parameters of the PPP, proceeds from a PPP loan were required to be used only for certain permissible business expenses, including payroll costs, mortgage interest, rent, and utilities. Defendant and Sary were aware that, under the applicable PPP rules, interest and principal on a legitimate PPP loan were eligible for forgiveness, if the business spent the loan proceeds on permissible items within a designated period of time and used a certain portion of the loan toward payroll expenses.

Accordingly, in an attempt to make it appear that the PPP loan funds were being used for legitimate purposes, on March 17, 2021, Defendant, at the suggestion of Sary, signed an agreement with Heartland Payment Systems, Inc. ("Heartland") to provide payroll services to purported employees of JAG Investments. Pursuant to the agreement, and at the direction of Defendant, Heartland withdrew funds from the JAG Investments FNB account referenced above, and made payments using the PPP funds to purported employees of JAG Investments, including Defendant, his brother, and various other friends and associates, including Co-conspirator #1 (discussed in further detail below).

The purpose of establishing payroll services for JAG Investments after receipt of the PPP loan was to facilitate the creation of documentation that could be used to substantiate a request for the PPP loan to be forgiven—which it ultimately was.

In total, $59,499.82 in sham payroll payments were made using funds traceable to the PPP loan obtained by Defendant and JAG Investments. None of the purported employees were in fact legitimately employed by JAG Investments during the time period after the PPP loan was received. Further, several of the purported employees, after receiving the purported payroll payments, provided a portion of the funds directly back to Defendant—usually by means of Cash App or Zelle payments. Moreover, in connection with the scheme, Defendant also engaged in email correspondence with Heartland concerning the purported employees to be added to the payroll.

Defendant did not make any payments to Cross River Bank in connection with the PPP loan obtained for JAG Investments.

### *Spending of PPP Funds*

Defendant spent the fraudulently obtained loan proceeds in various ways that were impermissible under the PPP program, including by paying $38,000 in kickbacks to Sary, using the funds to purchase and rehabilitate real estate in Baltimore City, providing PPP funds to various friends, family members and associates for purposes unrelated to employment, making large cash withdrawals for himself, and paying off various personal debts.

3

**Bribery Scheme**

Beginning in or about early 2016, at the latest, and continuing until the date of his arrest by law enforcement on or about September 20, 2023, Defendant engaged in a bribery scheme in which he abused his position of trust as a public official—an employee within the Baltimore City Department of Finance, Revenue Collections Department—for his own personal gain.

During this eight year period, Defendant routinely accepted bribes from various property owners in the City whose property was subject to various financial obligations and, if the obligations remained unpaid, tax sale. He accepted these bribes in exchange for removing or extinguishing these financial obligations owed to the City, including for citations, tax obligations, and water obligations—thereby causing losses to the City. Defendant also, at times, accepted bribes in exchange for delaying or postponing—without approval or permission from other City officials—due dates for the payment of outstanding financial obligations, fines, and payments owed to the City, thus forestalling the placement of a lien on the property by the City.

*Acceptance Of Bribes Paid By FBI UC*

Defendant engaged in multiple covertly recorded telephone and video conversations with a Federal Bureau of Investigation undercover agent ("UC") in which Defendant and the UC discussed Defendant receiving bribe payments in exchange for extinguishing certain monies owed to the City of Baltimore and for delaying / postponing due dates in relation to outstanding fines and or payments owed to the City of Baltimore in connection with certain properties.

In a recorded phone conversation with the UC, the UC confirmed the size of the bribe payment with Defendant: "[S]o you want 100 for each property?" Defendant said, "yeah that's basically how I do." Defendant then informed the UC that he (Defendant) had a "girl" in "water"— *i.e.*, the Baltimore City Department of Public Works—that could "wipe some shit out," referring to financial obligations owed to the City.

During a covert video recording of the conversation with the UC, Defendant told the UC that he had the ability to "wipe a bill off" the City's record of outstanding obligations tied to a particular property or to "put paid next to 'em," even though the financial obligation had not in fact been paid. Defendant further stated that he removed certain financial obligations linked to the properties that the UC told Defendant were his, stating "There was a couple, extra miscellaneous bills that y'all had that I wiped off. . . . That shit gone now." Defendant also extended the deadline for payment of financial obligations owed to the City on the eight properties by three months.

Defendant asked for $800 in bribes in return—$100 for each of the eight properties, and, during the recorded meeting, the UC provided Defendant $800 cash. Defendant also stated that he had the ability to wipe out overdue water bills owed to the City, "Once I let you know [about a big water bill], I'll give it to my girl, and I'll tell you what you need to give me for her to knock it off." Defendant then stated:

> Going forward, I'm just your inside man . . . That's what I do for a lot of different people around the City. You know what I mean – manage their shit for them a little bit. . . . I'm gonna go look at your shit. Any one with a high water bill I'm gonna text you the address, and I'm gonna tell you what I need, and we can knock them out going forward with that. . . . Any water bill that's too high, I'll get my girl to take care of that.

Defendant's bribery scheme continued for years thereafter, and he enlisted the help of multiple co-conspirators in connection with his scheme.

4

These co-conspirators (including Co-conspirator #1 and Co-conspirator #2) who, at times, referred various individuals seeking to have Defendant remove or reduce financial obligations owed to the City in exchange for bribes. Moreover, numerous individuals (including Co-conspirator #3) routinely paid bribes to Defendant in exchange for Defendant extinguishing various bills they owed to the City, including water bills and tax bills.

The size of the bribe paid to Defendant was typically 10% to 15% of the amount owed to the City. For example, if an individual owed the City $10,000 in outstanding tax and water bills, Defendant would typically seek a bribe in the amount of $1,000 to $1,500 in exchange for extinguishing the financial obligations and making the amount due and payable to the City zero dollars. Once Defendant received the bribe payment, he would extinguish the financial obligation owed to the City by marking the obligations as paid in the City's online records. After removing the obligation, Defendant would, at times, send a photograph of a cashier slip from his office reflecting that a payment was made towards a financial obligation owed to the City when, in fact, no such payment was made.

*Acceptance Of Bribes Facilitated By Co-Conspirator #1*

Moreover, for a period of at least 18 months, Co-conspirator #1 referred numerous individuals to Defendant for the purpose of Defendant, in exchange for a bribe from the individuals, removing various financial obligations owed to the City by the individuals. Co-conspirator #1 likewise demanded a bribe for his role in referring individuals to Defendant. Co-conspirator #1 would typically (1) coordinate with a particular individual and obtain the address of each property linked to the individual that owed money (e.g., outstanding taxes, water bills) to the City; and (2) send the address or addresses to Defendant by means of text messages.

Defendant would then (1) determine the total amount of financial obligations owed to the City for each address; (2) set the size of the bribe payment to Defendant that was required for him to extinguish the obligations owed on each address; (3) accept the bribe payment from Co-conspirator #1 who had already gathered it from the individual paying the bribe, which was typically cash; and (4) after receiving the bribe payment by cash or, occasionally, Cash App or Zelle (effecting interstate wires), remove the financial obligations owed to the City, despite the fact that no payment or payments to the City had in fact been made.

For example, in May 2022, Co-conspirator #1 sent by means of a text message to Defendant's personal mobile phone an address associated with an individual who approached co-conspirator #1 about enlisting Defendant's services. Defendant responded, "The water 5200[.] The tax like 2800"—referring to the dollar amounts owed to the City in connection with the property. Defendant then set the price of the bribe required to extinguish the financial obligations: "I will do 1200 for both bro." Co-conspirator #1 then responded, "let me get the br[e]ad"—referring to the bribe payment—"and then it's a go."

Likewise, in September 2023, Co-conspirator #1 again sent by means of a text message to Defendant's business mobile phone various addresses whose owners sought to extinguish the property tax financial obligations owed to the City on each address:

All tax
[Address 1]- 9173
[Address 2]- 8750
[Address 3]- 14,160
[Address 4]- 4720
[Address 5]- 1418

5

Defendant then wrote back and provided the dollar amount of the bribe required to extinguish the financial obligation for each property—approximately 10% of the dollar amount of each obligation:

    900
    800
    1200
    450
    200

Co-conspirator #1 responded, "[B]et I'm on it" and, the following day, "Gm bro it's a go I'll see u this evening." Co-Conspirator #1 would go on to collect the funds and provide them to Defendant the following day, noting in a text message, "Put 3200 in the mail slot that for the last list I sent u[.] Owe u $500[.] The money for [Address 6] in there."

### *Acceptance Of Bribes Facilitated By Co-Conspirator #2*

Defendant referred to Co-conspirator #2 as "Big Sis." Like Co-conspirator #1, Co-Conspirator #2 referred multiple individuals to Defendant for the purpose of Defendant, in exchange for a bribe from the individuals, removing various financial obligations owed to the City by the individuals. Co-Conspirator #2 would send Defendant various addresses that owed money (e.g., outstanding taxes, water bills) to the City, and Defendant, in turn, would after receiving the bribe payment remove the financial obligations owed to the City, despite the fact that no payment or payments to the City had in fact been made. Defendant would then send Co-Conspirator #2 receipts reflecting that the obligations had been paid when, in fact, they had not been.

Defendant communicated with Co-Conspirator #2 by phone and in person, and bribes were paid by Co-Conspirator #2 via cash and Cash App.

Moreover, apart from his work with Co-conspirator #1 and Co-conspirator #2 in connection with the scheme, Defendant also routinely received bribes from members of the public that owned properties in City, including Co-conspirator #3, in exchange for Defendant eliminating or lowering the financial obligations they owed to the City. Defendant communicated with those individuals in person and over text message.

### *Acceptance Of Bribes From Co-Conspirator #3*

For example, in September 2022, Defendant and Co-conspirator #3 discussed over text message various properties owned by Co-conspirator #3 that each had outstanding financial obligations due to the City. In response to an inquiry from Co-conspirator #3 concerning the three properties, Defendant wrote the monies owed in connection with each property, "[Address 7] is $18,303.13[.] [Address 8]-$18,669.85[.] [Address 9]- $10,018.7." Defendant wrote, "Can u pay about half on these ? And i take care of the rest[.] We can do 1 a week for the next couple weeks."

Co-conspirator #3 responded, "20%?" Thereafter, Defendant and Co-conspirator #3 continued to negotiate about what portion of the moneys owed to the City would be paid by Co-conspirator #3, the size of the bribe Co-conspirator #3 would provide to Defendant and, eventually, the timing of their meeting. For instance, Co-conspirator #2 and Defendant had the following exchange:

Co-conspirator #3:  What's the lowest possible?

Defendant:  7 ?

Co-conspirator #3:  I thought I was hitting u w 25%

6

Defendant:  How much u got for it man lol

Co-conspirator #3:  As much for you and as little for them as possible?

Defendant:  6k for city ?  That's cool on 18 bro

Co-conspirator #3:  f the city. and YES!  $6k even?

Defendant:  Bout 6500

. . . .

Co-conspirator #3:  Cash or cashiers check?

Defendant:  Cash

. . . .

Co-conspirator #3:  Me and u today I'm good if your good. Inside or outside?

Defendant:  Come get bill  Go to mens room After paid  Handshake hug done  Lol[.]

Co-conspirator #3 paid Defendant a $2,500 bribe in exchange for Defendant's removal of more than $11,659.80 in funds owed to the City.  Defendant noted, "2021 taxes was $12,284.86 interest was $474.08 first half of new tax $5400.86 which is total of $18,159.80 u paid $6500."  Co-Conspirator #3 would go on to pay Defendant on multiple occasions thousands of dollars in cash bribes and $9,253 in bribes via Cash App and Zelle payments to Defendant in connection with the removal of various financial obligations Co-Conspirator #3 owed the City.  Defendant also engaged in email correspondence with Co-conspirator #3 in connection with the bribery scheme.

In total, Defendant received more than $250,000 in connection with his bribery scheme and caused losses to Baltimore City in excess of $1,250,000.

## II. Guidelines Computation

The PSR correctly calculates Defendant's total offense level as 25—after reductions for acceptance of responsibility under U.S.S.G. § 3E1.1 and in light of Defendant's status as a Zero Point Offender under U.S.S.G. § 4C1.1.  PSR at 12-13.

Defendant is a Criminal History Category I.  PSR at 22.  Thus, the applicable guideline imprisonment range as to Count One is 57-71 months' imprisonment.  *Id.*

## III. Sentencing Factors Under 18 U.S.C. § 3553(a)

The sentencing factors under 18 U.S.C. § 3553(a) support a sentence of 60 months' imprisonment.

Such a sentence is necessary to reflect the seriousness of the offense and protect the public from further crimes of Defendant, as well as to afford adequate deterrence, promote respect for the law, and provide just punishment.  It also takes into account Defendant's history and characteristics.

### A. Nature And Circumstances Of The Offense.

Regarding the nature and circumstances of the offense, there is no question that Defendant's offense is serious.

To begin, public corruption has had a long-standing presence in and has been a persistent scourge on Baltimore City.  Defendant, through his pattern of corrupt activity, deprived all the

7

residents of Baltimore City of honest government.  He engaged in this conduct brazenly and boldly for nearly a decade.  Defendant's conduct has further eroded the public trust in Baltimore City public officials.  To be sure, Defendant was not a high-level city official; rather, he was a frontline worker, routinely engaging with the public.  But this matters not.  He held a position of public trust within the Department of Finance, and his self-serving actions cost Baltimore City at least $1.25 million.  The citizens of Baltimore deserve better.

What's more, not only was Defendant's criminal activity pervasive and long-lasting—going on for nearly a decade—it was fueled by nothing more than greed.  Defendant repeatedly made the choice to use his role at the Department of Finance to line his own pockets, extinguishing more than $1.25 million in financial obligations owed to Baltimore City in exchange for at least a quarter million dollars in bribe payments.  The facts admitted by Defendant make it plain that Defendant was no novice when it came to corruption:  He knew how to play the angles to get his slice. The FBI recording and Defendant's own statements in his communications with co-conspirators vividly demonstrate the ease with which Defendant exploited his public position for private gain.  As he put it, he was their "inside man."

Not once in any of the recordings or in his text message communications did Defendant indicate that he was motivated by what was good for the City of Baltimore or what was best for its taxpaying constituents.  Just the opposite.  Again and again, Defendant had dollar signs in his eyes. He was all too ready to wipe out monies owed to the City if it meant he could make a few thousand dollars for himself in each exchange.  These thousands added quickly over time, and, as noted, he ultimately obtained over a quarter million dollars in bribes.  Defendant's actions also seriously harmed the City which relied on revenue from property taxes and water bills—like any other source of revenue[1]—to operate at a basic level.  By extinguishing these debts in favor of his own gain, Defendant harmed the institution and its taxpayers that he had been hired to serve.

Defendant's greed is also evident in connection with his scheme to fraudulently obtain CARES Act relief funds.  During the most traumatic global pandemic in a century, Defendant stole $143,104 in public funds that were intended to prop up our nation's small businesses so that they could avoid economic collapse.  These  funds—meant to help struggling businesses—were instead used for purposes impermissible under the PPP, including to purchase and rehabilitate real estate in Baltimore City.  Defendant also gave PPP funds to various friends, family members, and associates for purposes unrelated to employment, and used the funds to pay off various personal debts.

Defendant lied on loan applications, and he laundered loan funds by setting up bogus payroll for purported employees—his friends and family—to conceal his scheme.  And, just like the bribery scheme, Defendant's offense was not the result of a momentary lapse of judgment by an otherwise law-abiding citizen.  It was not a split-second decision made under financial duress. To the contrary, when the opportunity arose, Defendant wrongfully took advantage of a relief program meant to aid victims of an unprecedented public health and economic crisis by COVID-19 relief funds that he was not otherwise entitled to through fraud.

Defendant's choice to misappropriate PPP funds funneled critical resources away from legitimate businesses that did not survive the pandemic.  Indeed, in the early days of the COVID-19 pandemic, people stayed home, businesses closed their doors, and workers were laid off. America was effectively shut down.  In the face of chaos and uncertainty, the Government moved quickly to establish pandemic relief programs, like PPP and EIDL, for suffering people and

---

[1] Baltimore's financial woes are well documented.  *See, e.g.*, *Baltimore could face $1.8B budget deficit over 10 years finance officials project*, The Baltimore Banner, Adam Willis (Dec. 14, 2023).

businesses. And to get money quickly to people who needed it most, these pandemic relief programs relied on applicants to tell the truth. But in the face of this crisis, Defendant did the opposite—he saw an opportunity to enrich himself based on lies, and he took it.

Taken as a whole, the scope of Defendant's conduct was extensive—with respect to the length of time Defendant perpetrated his schemes, the number of co-conspirators involved, the amount of loss to the victims, and the sophistication of the PPP scheme (including attempting to launder the fraudulently obtained funds as "payroll").

At bottom, the five-year sentence sought by the Government adequately reflects the nature and circumstances of the offense.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

So too does the Government's recommended sentence reflect the seriousness of Defendant's misconduct, provide just punishment, and promote respect for the law. Defendant engaged in a prolonged, calculated, and deliberate pattern of bribery activity that took place over the course of nearly a decade. He accepted over $250,000 in bribes during this period, and cost Baltimore at least $1,250,000.

Defendant made a conscious choice every time he accepted or solicited a bribe to wipe out a legitimate debt owed to the City and to break the law. He could have stopped; he chose not to—for many, many years.

And he likewise made the choice to abuse COVID-19 relief programs. The PPP was designed to be a safety net to keep the nation's small businesses in operation during the most significant global pandemic in 100 years. Unfortunately, due to the conduct of people like Defendant, a staggering amount of pandemic relief funds did not reach the businesses and employees that needed those funds most. The SBA Office of Inspector General estimates that as much as 17% of the disbursements from pandemic-relief programs like the PPP went to fraudulent applicants like Defendant.[2] Indeed, the PPP had a finite pool of money; during the first round of the PPP, the program was depleted in just 13 days.[3] Given the high levels of fraud in connection with PPP funds, there is a particularly substantial need to promote respect for the law and provide just punishment for the offense.

### C. The Need To Avoid Unwarranted Sentencing Disparities.

The need to avoid unwarranted sentencing disparities is also important in this case. While no two defendants are precisely similarly situated, and the facts and circumstances of every case are different,[4] it still nevertheless may be instructive for the Court to consider sentences judges

---

[2] *See* Small Business Administration, COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape Report, *available at* https://www.sba.gov/document/report-23-09-covid-19-pandemic-eidl-ppp-loan-fraud-landscape ("We estimate that SBA disbursed over $200 billion in potentially fraudulent COVID-19 EIDLs, EIDL Targeted Advances, Supplemental Targeted Advances, and PPP loans. This means at least 17 percent of all COVID-19 EIDL and PPP funds were disbursed to potentially fraudulent actors.")

[3] *See* PBS Newshour, It took 13 days for the Paycheck Protection Program to run out of money. What comes next?, *available at* https://www.pbs.org/newshour/politics/it-took-13-days-for-the-paycheck-protection-program-to-run-out-of-money-what-comes-next

[4] *See, e.g.*, *United States v. Friend*, 2 F.4th 369, 382–83 (4th Cir. 2021) ("Courts have repeatedly made clear that comparisons of sentences may be treacherous because each sentencing proceeding is inescapably individualized.").

(including the Court) have in the past imposed in connection with cases involving pandemic fraud such as this one.

Simply put, pandemic loan fraud cases involving criminal conduct similar to the offense conduct at issue here—including the submission of fraudulent pandemic loan applications containing fake IRS forms and false information regarding nonexistent businesses during a time of national crisis—have routinely yielded significant sentences in this District. *See, e.g.*, *United States v. Sary*, Crim. No. RDB-23-344 (seven year sentence imposed on defendant with no criminal history who was responsible for over $17 million dollars in fraud);[5] *United States v. Walker*, Crim. No. RDB-22-290 (24 months' imprisonment and 6 months' home confinement imposed on defendant who was responsible $262,252 in fraud);[6] *United States v. Hopkins*, Crim. No. RDB-23-316 (24 month sentence imposed on defendant with no criminal history who was responsible for $1,018,224 in fraud);[7] *United States v. Qureshi*, Crim. No. JKB-22-0330 (year and a day sentence imposed on defendant with no criminal history who was responsible for $250,723 in fraud).[8]

The Government's recommended sentence of 60 months' imprisonment here appropriately reflects the differences among Defendant and these individuals while avoiding unwarranted disparities. Indeed, not one of the cases referenced above also involved the very significant aggravating factor present here—an eight-year long bribery scheme that cost the City of Baltimore at least $1,250,000.

### D. History And Characteristics Of Defendant.

As for Defendant's history and characteristics, it appears based on the PSR that Defendant was raised in a verbally and physically abusive environment and that he has in the past suffered from mental health issues. This is unfortunate. While these points—like all of Defendant's history and characteristics—merit consideration by the Court, they do not support a variant sentence. In fact, compared to many other defendants, Defendant has benefitted from numerous positive factors in his life, including a high school diploma from Edmondson High School, a passion for football, the apparent ability to work and earn pay legitimately (when he chooses to), and a loving and supporting family. There simply are no extenuating or mitigating factors in this case that warrant a downward variance from the Guidelines.

### IV. The Government's Sentencing Recommendation

In light of all of the factors set forth above, the Government recommends that the Court sentence Defendant to a term of imprisonment of 60 months' imprisonment to be followed by three years' supervised release.

The Government also asks that the Court enter a money judgment in the amount of at least $392,104 and order restitution in the amount of $1,393,104—$143,104 to the United States Small Business Administration and $1,250,000 to the City of Baltimore, with the following amounts joint and several as set forth below in connection with the following related case:

---

[5] Sary's sentencing guideline range was 108 to 135 months' imprisonment. He had no criminal history.

[6] Walker's sentencing guidelines range was 30-37 months' imprisonment.

[7] Hopkins' sentencing guidelines range was 41-51 months' imprisonment. He had no criminal history.

[8] Qureshi's sentencing guidelines range was 12-18 months' imprisonment. He had no criminal history.

10

- *United States v. Sary*, RDB-23-344
    - Cross River Bank: $138,104.

                      Respectfully submitted,

                      Phillip A. Selden
                      Acting United States Attorney

                      /s/
By:  Paul A. Riley
      Evelyn L. Cusson
      Assistant United States Attorneys

cc:    Gerald Ruter, Esq. (by ECF)
        Adam Smith, U.S. Probation Officer (by electronic mail)